## THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| CARRIE RUSCHMAN, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CHARTER COMMUNICATIONS, INC., <br><br> Defendant. | Case No. 3:26-cv-00868 <br><br><br> **COMPLAINT – CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Carrie Ruschman, ("Plaintiff"), by and through their undersigned counsel, file this Class Action Complaint individually and on behalf of a class of all similarly situated persons against Defendant Charter Communications, Inc. ("Charter" or "Defendant"). Plaintiff alleges the following based on her personal knowledge, information and belief, and the investigation of her counsel.

### NATURE OF THE ACTION

1. Charter is one of the largest telecommunications and media companies in the United Sates, providing broadband internet, cable television, mobile, and voice services to tens of millions of residential and business customers across the country.

2. In that capacity, Charter has directly and indirectly collected highly sensitive personally identifiable information ("PII") such as customer proprietary network information (CPNI), customer names, email addresses, physical addresses, phone numbers, phone type, billing information, and plan information (collectively "Sensitive Private Information") from tens of millions of customers. Plaintiff and Class Members were required to entrust Defendant with a vast array of such Sensitive Private Information.

1

3.      Taking reasonable, standard precautions against cybercrime and data breaches is a fundamental part of doing business in the modern age—especially for businesses in the telecommunications sector that routinely collect and store confidential information like the Sensitive Private Information at issue here.

4.      By collecting and maintaining Plaintiff and the Class Members' Sensitive Private Information, Defendant was required by law to exercise reasonable care and comply with industry and statutory requirements to protect that information.  Indeed, Charter acknowledges "Your privacy is important to Charter.  We take seriously the responsibility of protecting your privacy and the information collected about you."  Charter admits that certain laws "impose[] certain limitations on our collection, use, and sharing of information that personally identifies you when you subscribe to cable video and telecommunications services, or other services provided using [Charter's systems]."[1]

5.      Despite this promise and its legal obligations to safeguard the Sensitive Private Information entrusted to it, Defendant implemented inadequate data security measures and allowed the information of approximately 42 million of its customers to be stolen by cybercriminals.

6.      On or around April 1, 2026, a group of cybercriminals infiltrated Defendant's computer systems, accessed, and exfiltrated file repositories that contained Plaintiff's and Class Members' Sensitive Private Information (the "Data Breach").

7.      The Data Breach was a direct, foreseeable, and even likely result of Defendant's deficient cybersecurity practices.  The wealth of publicly available information and industry warnings regarding cyberattacks makes Defendant's failures all the more egregious.  Defendant

---

[1]      *Spectrum  Privacy  Policy*,  CHARTER  COMMUNICATIONS  (Jan.  1,  2026), https://www.spectrum.com/policies/privacy-policy#security.

disregarded the rights of Plaintiff and Class members by failing to implement proper and reasonable measures to safeguard the Sensitive Private Information in its custody, and by failing to take the available and necessary steps to prevent the unauthorized disclosure of that information.

8.      While Defendant's breach of its duties led to the Data Breach, it is Plaintiff and other victims of the Data Breach that will bear the burden for years to come.  The exponential cost to Plaintiff and the Class Members resulting from the Data Breach cannot be overstated.  Criminals can use victims' names, birth dates, social security numbers, and addresses to open new financial accounts, rack up fraudulent charges, obtain government benefits and IDs, fabricate identities, file fraudulent tax returns, and commit medical insurance fraud well before the person whose Sensitive Private Information was stolen becomes aware of it.  Any one of these instances of identity theft can have devastating consequences for the victim—causing years of damage to their credit scores, financial stability, and personal security.

9.      Through this lawsuit, Plaintiff seeks to hold Defendant responsible for the injuries it inflicted on Plaintiff and tens of millions of similarly situated individuals due to its impermissibly inadequate data security measures, and to obtain injunctive relief requiring, among other things, the implementation of security measures sufficient to protect the Sensitive Private Information that remains in Defendant's custody and control.  Such injuries include: (i) lost value of Sensitive Private Information, a form of property that Defendant obtained from Plaintiff and Class members; (ii) out-of-pocket expenses associated with preventing, detecting, and remediating identity theft, social engineering, and other unauthorized use of their Sensitive Private Information; (iii) opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) the continued, long term, and certain risk that unauthorized persons will access and abuse Plaintiff and Class Members' Sensitive Private

3

Information; (v) the continued and certain increased risk that the Sensitive Private Information that remains in Defendant's possession is subject to further unauthorized disclosure for so long as Defendant fails to undertake proper measures to protect it; (vi) theft of their Sensitive Private Information and the resulting loss of privacy rights in that information; (vii) credit freezes and unfreezes; (viii) decreased credit scores; (ix) lost work time; and (x) anxiety, annoyance, and nuisance.

10.    Accordingly, Plaintiff brings this action on behalf of herself and the proposed Class for, among other things, negligence, and negligence per se.

## PARTIES

11.    Plaintiff Carrie Ruschman is an adult natural person and a customer of Charter, whose Sensitive Private Information was collected, stored, and maintained by Defendant. Plaintiff Ruschman resides in Montana.

12.    Defendant Charter Communications, Inc. is a Delaware corporation with its headquarters and principal executive office located at 400 Washington Boulevard, Stamford, Connecticut.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d), because Plaintiff and at least one member of the Class, as defined below, are citizens of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

14. Defendant is subject to personal jurisdiction in Connecticut because it maintains its principal place of business here, conducts substantial business here, and the acts and omissions giving rise to Plaintiff's claims occurred, in substantial part, in this District.

15. Venue is proper in this Court under 28 U.S.C. §1391 because Defendant resides in this District, maintains its principal place of business in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District, including Defendant's collection, storage, and maintenance of Sensitive Private Information; the failure to implement reasonable data security measures; the operation and oversight of the systems compromised in the Data Breach; and Defendant's decisions regarding breach detection, investigation, and notification.

## FACTUAL BACKGROUND

**I. DEFENDANT AFFIRMATIVELY COLLECTED, STORED, AND RETAINED PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE PRIVATE INFORMATION.**

16. Defendant is a telecommunications and media company that provides internet, cable, mobile, and voice services under the Spectrum brand. The company serves tens of millions of residential and business customers across a broad, multi-state footprint, making it one of the largest telecommunications service providers in the country.

17. In the course of providing its services, Charter collected substantial information regarding its customers, including Personally Identifiable Information, like customer names, email addresses, physical addresses, and phone numbers. Charter also collects and maintains highly sensitive and federally protected information, like CPNI, including phone type, plan information, and billing information for all of these customers.

18. Plaintiff and Class Members are individuals who entrusted, and in fact, were required to provide their Sensitive Private Information to Defendant. Plaintiff and the Class

5

reasonably expected that Defendant would secure their Sensitive Private Information. They had good reason for their expectation— Charter promised to do so.

19. By collecting and storing Plaintiff's and Class members' Sensitive Private Information, Defendant assumed equitable and legal duties to implement adequate data security measures to protect and safeguard Plaintiff's and Class members' information from unauthorized access and disclosure. Defendant was the only entity capable of securing the data in its possession against a foreseeable data breach, and Plaintiff and the Class were entirely reliant on Defendant to protect their Sensitive Private Information.

20. Defendant, however, breached these duties by implementing inadequate data security measures, creating a foreseeable risk of harm to Plaintiff and the Class that materialized during the Data Breach, and further resulting in the access and exfiltration of Plaintiff's and Class members' Sensitive Private Information by cybercriminals.

## II. DEFENDANT KNEW THE RISKS OF COLLECTING AND STORING SENSITIVE PRIVATE INFORMATION.

21. At all relevant times, Defendant knew it was collecting and storing employees' Sensitive Private Information, and that as a result, its systems would be attractive targets for cybercriminals.

22. Sensitive Private Information—particularly the highly sensitive CPNI information that Defendant collected, stored, and retained—has significant value on the criminal black market, including on the Dark Web, particularly in data sets containing all of the necessary building blocks to commit a variety of fraudulent schemes and identity theft. And once exposed, this information cannot be made private again.

23. Numerous sources cite Dark Web pricing for stolen identity credentials. For example, a single victim's Personal Information can be sold at a price ranging from $40 to $200,

6

and bank details have a price range of $50 to $200.[2]  Unfortunately, law enforcement has difficulty policing Dark Web activity due to encryption that permits sellers and purchasers to conceal their identity.

24.     While the disclosure of compilations of Sensitive Personal Information are undoubtedly harmful, even the disclosure and misuse of discrete pieces of information—especially unique government identification numbers like Social Security, passport and driver's license numbers that cannot be easily replaced—can cause significant harm.  Even when such numbers are replaced, the process of doing so results in a major inconvenience to the impacted victim, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

25.     For example, the Social Security Administration warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for an identity theft victim:

> Keep in mind that a new number probably will not solve all your problems.  This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number.  Along with other personal information, credit reporting companies use the number to identify your credit record.  So using a new number will not guarantee you a fresh start.  This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems.  If the old credit information is not associated with your new number, the absence of

---

2       Anita George, *Your personal data is for sale on the dark web.  Here's how much it costs*, DIGITAL TRENDS MEDIA GROUP (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs; *see also* Ben Luthi, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Jun. 30, 2025), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

any credit history under the new number may make it more difficult for you to get credit.[3]

26.     Because government identification numbers like Social Security numbers cannot be easily or quickly changed, victims of identity theft from data breaches often face multiple incidents of fraud over their lifetime due to the reuses of stolen data, and "may not find out that someone is using [their] [Social Security number] until [they]'re turned down for credit, or [they] begin to get calls from unknown creditors demanding payment for items [they] never bought,"[4] which highlights the long-term harms caused by the breach of such sensitive data.

27.     Government agencies thus consider Social Security Numbers to be so sensitive as to warrant special considerations to ensure their security, regardless of whether they are maintained as "stand-alone [data] [or] when associated with any other identifiable information[.]"[5]  With your full or even partial SSN and other personal information easily found online, scammers can commit credit card fraud, open new accounts, and receive medical care in your name — as well as siphon away your Social Security benefits.[6]  Even if cybercriminals do not gain access to a complete set of an individual's PII during a data breach, cybercriminals can cross-reference two or more sources of stolen information to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals.  These dossiers are known as "Fullz" packages.

---

[3]     *Identify Theft and Your Social Security Numbers*, SOC. SEC. ADMIN., 6 (Mar. 2026), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[4]     *Identity Theft and Your Social Security Number*, SOC. SEC. ADMIN., 1 (Mar. 2026), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[5]     *See, e.g.*, FREQUENTLY ASKED QUESTIONS (FAQ), U.S. DEP'T OF COM., OFF. OF PRIV. AND OPEN GOV'T, https://www.commerce.gov/opog/frequently-asked-questions-faq (last visited Jun. 2, 2026).

[6]     Hari Ravichandran, *What Can Someone Do with Your Social Security Number?*, AURA (Apr. 8, 2024) https://www.aura.com/learn/what-can-someone-do-with-your-social-security-number.

28.     The development of "Fullz" packages means stolen information from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers.  In other words, even if certain information such as emails, phone numbers, or credit card numbers is not included in the Sensitive Private Information stolen in a specific incident, criminals can easily create a "Fullz" package that links that information together and sell the package at a higher price.

29.     Importantly, once a cybercriminal has a "Fullz" package, cybercriminals can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[7] Most problematic, however, is that cybercriminals in possession of a "Fullz" package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[8]

30.     Customer Proprietary Network Information is an especially sensitive category of data generated through a customer's use of telecommunications services, including call records, billing details, and service usage patterns.  Because CPNI can reveal who individuals communicate with, when, and from where, it provides a detailed portrait of a person's private life and relationships, making it highly valuable to cybercriminals if compromised.  Federal law therefore imposes a duty on telecommunications carriers to protect the confidentiality of this information and restrict its unauthorized disclosure.[9]

---

[7]     Paige Tester, *What Are Fullz? How Hackers & Fraudsters Obtain & Use Fullz*, DATADOME (Dec. 18, 2025), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work.

[8]     *Protection Against Fullz and Fraud, Integrity*, INTEGRITY ARISTOTLE INT'L (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

[9]     Privacy/Data Security/Cybersecurity: Customer Proprietary Network Information, (Fed. Commc'ns Comm'n, Dec. 20, 2022), https://www.fcc.gov/enforcement/areas/privacy; Protecting Your Personal Data, (Fed. Commc'ns Comm'n, Jan. 12, 2026), https://www.fcc.gov/protecting-your-personal-data.

31.     The telecommunications sector is increasingly targeted for cyberattacks due to the concentration of sensitive customer data such as CPNI within carrier systems.  Industry reporting shows that cyberattacks against telecom providers rose significantly in recent years, with ransomware attacks numbering in the thousands, underscoring the growing scale and frequency of threats to customer data, including Plaintiff and the Class.  These trends mirror broader concerns that telecom networks, and the CPNI they collect and maintain, are prime targets for data exfiltration and exploitation.[10]

32.     The value of telecommunications data, including CPNI, stems from its utility in identity-based and account-access fraud schemes.  When combined with other personal data, telecom records can enable criminals to impersonate customers, reset passwords, intercept communications, and bypass authentication systems.  This makes such data highly valuable in underground markets and a central component of modern fraud operations, comparable to or exceeding the utility of traditional identifiers like Social Security numbers.[11]

33.     Criminal exploitation of compromised CPNI can extend beyond financial fraud to coercion and targeted attacks that leverage insights into a victim's personal communications and relationships.  Telecom data can reveal patterns of behavior and sensitive associations, enabling sophisticated social engineering, extortion, or surveillance campaigns.  The Federal Bureau of Investigation has identified phishing, extortion, and personal data breaches as among the most

---

[10]     *Major Cyber Attacks Targeting the Telecommunications Industry (2023-2024)*, SOCRADAR (Dec. 13, 2024), https://socradar.io/blog/cyber-attacks-telecommunication-industry-2023-2024/;          Patrick          Llewellyn, *Telecommunications Statistics*, WORLDMETRICS (Feb. 12, 2026), https://worldmetrics.org/telecommunications-statistics/.

[11]     *See* Kevin Henry, *T-Mobile's Massive Data Breach Explained: Real-World Scenarios and Everything You Need to Know*, ACCOUNTABLE, INC. (Mar. 16, 2025), https://www.accountablehq.com/post/t-mobile-s-massive-data-breach-explained-real-world-scenarios-and-everything-you-need-to-know.

prevalent cybercrimes, demonstrating how stolen communications-related data can be weaponized against individuals.[12]

34.    Like comprehensive dossiers of personal data, compromised CPNI significantly increases the effectiveness of targeted phishing and "Spear Phishing" attacks.  Information such as call metadata, account details, and service usage allows cybercriminals to craft highly personalized and credible messages that are more likely to deceive victims.  Real-world telecom breaches, including multiple incidents affecting millions of customers, have demonstrated that inadequate safeguards for CPNI can expose individuals to large-scale phishing campaigns and account-takeover risks, reinforcing the need for robust carrier security practices.[13]

35.    Phishing attacks are fraudulent communications—typically emails, text messages, or phone calls—designed to deceive recipients into revealing Sensitive Private Information such as login information, financial account numbers, or other highly Sensitive Private Information. These attacks often impersonate trusted institutions, including banks, government agencies, and current and former employers, and have become increasingly sophisticated in their ability to appear legitimate.[14]

36.    Spear phishing is a targeted and particularly dangerous variant of phishing in which attackers use Personal Information about a victim—such as their name, address, employment information, Social Security number, government identification numbers, or other details—to craft highly personalized and convincing fraudulent messages.  Unlike generic phishing attacks sent to

---

[12]    Press Release, Fed. Bureau of Investigation, FBI Releases Annual Internet Crime Report, (Apr. 23, 2025) (on file with author).

[13]    Lizzie Danielson, *T-Mobile 2023 API Data Breach*, HUNTRESS (Nov. 14, 2025), https://www.huntress.com/threat-library/data-breach/tmobile-data-breach.

[14]    *Spoofing and Phishing*, FED. BUREAU OF INVESTIGATION, https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/spoofing-and-phishing (last visited Jun. 2, 2026).

mass audiences, spear phishing messages are tailored to the specific individual, dramatically increasing the likelihood that the recipient will be deceived.  Information held by an employer is particularly valuable for malicious actors to use to construct such targeted attacks.[15]

37.     Cybersecurity researchers and law enforcement agencies, including the FBI and the Cybersecurity and Infrastructure Security Agency (CISA), have repeatedly documented the connection between data breaches and subsequent phishing campaigns targeting affected individuals.  For example, in the aftermath of the National Public Data breach in 2024, Microsoft warned consumers that the data breach created a "high likelihood" of phishing attacks using the information stolen in that breach.[16]

38.     Aside from these risks of identity theft, fraud, and phishing or spear phishing attacks, PII is also property that has monetary value to data breach victims.

39.     While the economic value of individual data was leveraged largely by corporations who pioneered the methods of its extraction, analysis, and use, market exchanges have sprung up where individual users like Plaintiff can sell or monetize their own data.  For example, Nielsen Data and Mobile Computer will pay users for their data.[17]  Likewise, apps such as Zynn, a TikTok competitor, pay users to sign up and interact with the app.[18]

---

[15]     *Spear Phishing vs. Phishing: What's the Difference?*, ANALYST1 (Oct. 12, 2023), https://analyst1.com/spear-phishing-vs-phishing/.

[16]     *National Public Data breach: What you need to know*, MICROSOFT, https://support.microsoft.com/en-us/topic/national-public-data-breach-what-you-need-to-know-843686f7-06e2-4e91-8a3f-ae30b7213535 (last visited Jun. 2, 2026).

[17]     Kevin Mercandante, *Ten Apps for Selling Your Data for Cash,* BEST WALLET HACKS (Aug. 19, 2025), https://wallethacks.com/apps-for-selling-your-data/.

[18]     Jacob Kastrenakes, *A new TikTok Clone hit the top of the App Store by paying users to watch videos*, THE VERGE (May 29, 2020), https://www.theverge.com/2020/5/29/21274994/zynn-tiktokclone-pay-watch-videos-kuaishou-bytedance-rival.

40.     There are numerous examples of this kind of market, which is growing more robust as information asymmetries are diminished when users discover how their data is being covertly intercepted, collected, used, and disclosed.

41.     According to an essay published by the Centre for International Governance Innovation:

> The social and economic importance of personal data is well understood.  Personal data — typically defined as "information about an identifiable individual" — is central to a person's identity and can reveal intimate details about them.  For businesses and governments that collect personal data, this information is often necessary to provide goods or services to specific individuals.  However, personal data can also be used in the design and creation of goods or services.  For example, such data can be used to create profiles or to drive targeted advertisements.  Personal data is used in massive quantities to train artificial intelligence (AI) systems; it is also important to a variety of research activities.[19]

42.     In other words, a successful cyberattack leaves criminals with a lucrative and readily monetized supply of Sensitive Private Information—and deprives its victims of the exclusive use of their own information.

43.     The value of this information has led to a marked increase in the number of data breaches in the United States.

44.     Defendant knew or should have known that the Sensitive Private Information it collected and retained—including PII—was highly sensitive and of significant value to cybercriminals, as this information is routinely bought, sold, and exploited on criminal marketplaces, including on the Dark Web, where it can be used to commit identity theft, financial fraud, medical identity theft, tax fraud, and other crimes.[20]

---

[19]     Teresa Scassa, *Different Perspectives on Notions of Value The Shifting Value of Personal Data*, CIGI (Nov. 12, 2024), https://www.cigionline.org/articles/the-shifting-value-of-personal-data/.

[20]     *Major Cyber Attacks Targeting the Telecommunications Industry (2023-2024)*, SOCRADAR (Dec. 13, 2024), https://socradar.io/blog/cyber-attacks-telecommunication-industry-2023-2024/.

45.     Likewise, the documented increase in cyberattacks, combined with increasing monetary incentives that heighten the risk of future attacks, was widely known to the public and to anyone in Defendant' industry, including Defendant, at the time of the Data Breach.

46.     Defendant was therefore on notice of the risk of cyberattack and misuse of data in its custody well before the Data Breach.  Highly publicized data breaches involving similarly situated entities had already demonstrated that centralized repositories of telecommunications data are prime targets for cybercriminals seeking to exfiltrate and monetize Sensitive Private Information.

47.     Plaintiff and Class Members relied on Defendant to keep their Sensitive Private Information confidential and secure, to use their information for business purposes only, to delete their information when it was no longer reasonably necessary to retain, and to make only authorized disclosures of their information.

48.     By obtaining, collecting, and storing Plaintiff's and Class Members' Sensitive Private Information, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' Sensitive Private Information from foreseeable risks of disclosure to unauthorized parties.  Defendant agreed to and undertook legal duties to securely store and maintain the Sensitive Private Information of Plaintiff and Class Members.

49.     Indeed, as demonstrated by the foregoing, Defendant's collection, storage, and retention of Sensitive Private Information created a foreseeable and substantial risk of precisely the type of harm suffered by Plaintiff and Class Members, including loss of control over their Personal Information, increased risk of identity theft and fraud, actual misuse of their PII and PHI, and the need for ongoing mitigation measures.

14

### III.    DEFENDANT FAILED TO PROTECT THAT SENSITIVE PRIVATE INFORMATION, RESULTING IN THE DATA BREACH.

50.    On or around April 1, 2026, unauthorized actors gained access to Defendant's computer systems and acquired files containing Sensitive Private Information.  The incident resulted from Defendant's failure to adequately secure its networks, systems, and data against foreseeable cyber threats.  As a result of the intrusion, cybercriminals were able to access and potentially exfiltrate Sensitive Private Information belonging to affected individuals.

51.    The information compromised in the breach included, among other things, CPNI, customer names, email addresses, physical addresses, phone numbers, phone type, billing information, and plan information.  Such information is highly valuable to identity thieves and can be used to commit fraud, identity theft, medical identity theft, and other forms of misuse. Individuals whose information was exposed therefore face an ongoing and heightened risk of identity theft, financial fraud, and other harms resulting from the breach.

52.    Only on the eve of the hackers' threat to post the Sensitive Private Information on the Dark Web, did Charter disclose that the hack had occurred.  Charter has still not provided individual notice to customers.

### IV.    THE DATA BREACH AND THE RESULTING HARM WAS ENTIRELY FORESEEABLE AND DEFENDANT FAILED TO PROTECT AGAINST IT OR TO MINIMIZE ITS IMPACT.

53.    The risk of a data breach was well known and foreseeable to Defendant.  As set forth *supra*, Sensitive Private Information of the type Defendant maintained is a prime target for cybercriminals, and ransomware attacks against large companies and centralized data storage systems were widespread and escalating well before the intrusion.

54.    Despite this known risk, Defendant failed to implement reasonable cybersecurity safeguards appropriate to the nature and scope of the data it collected and retained.

15

55.     Cybersecurity firms and federal agencies have promulgated a series of best practices that should be implemented by companies that handle or facilitate the handling of Personal Information like that Defendant collected and kept, including, at minimum: establishing secure password and authentication procedures for employees; building secure networks by setting up network protection tools like firewalls and constantly monitoring for and patching vulnerabilities; monitoring active and inactive IP addresses, whitelisting software, and monitoring suspicious traffic on their networks; encrypting sensitive data using robust encryption algorithms; limiting access to data to only relevant staff; and properly training staff regarding password hygiene, phishing attacks, and social engineering attacks.[21]

56.     The Federal Trade Commission (the "FTC") has issued numerous guides for business outlining reasonable data and cyber security practices to diminish data breaches and the resulting harm to consumers and financial institutions, which it believes should be factored into all business decision-making.[22]

57.     The FTC's 2016 publication *Protecting Personal Information: A Guide for Business*—which the agency re-endorsed in October 2023—established guidelines for fundamental data and cyber security principles and practices for business.[23] The guidelines note businesses should, among other best practices:

---

[21]     *Customer Data Security: Best Practices for Data Privacy*, CONSUMER DATA PLATFORM, https://cdp.com/articles/customer-data-security-best-practices/; E. McCallister, T. Grance, & K. Scarfone, NIST U.S. DEP'T OF COMM., SPECIAL PUBLICATION 800-122, *Guide to Protecting the Confidentiality of Personally Identifiable Information (PII)*, (Apr. 2010), https://nvlpubs.nist.gov/nistpubs/legacy/sp/nistspecialpublication800-122.pdf.

[22]     FED. TRADE COMM'N, START WITH SECURITY: A GUIDE FOR BUSINESS, 2 (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[23]     FED. TRADE COMM'N, PROTECTING PERSONAL INFORMATION: A GUIDE FOR BUSINESS (2016), https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business. *See also* FED. TRADE COMM'N., START WITH SECURITY: A GUIDE FOR BUSINESS (2023), https://www.ftc.gov/business-guidance/resources/start-security-guide-business, (reiterating the principles underlying *Protecting Personal Information: A Guide for Business* and acknowledging "[t]hreats to data may transform over time, but the fundamentals of sound security remain constant.")

a.    Protect the personal customer and consumer information that they keep;

b.    Properly dispose of personal information that is no longer needed;

c.    Encrypt information stored on computer networks;

d.    Understand their network's vulnerabilities; and

e.    Implement policies to correct security problems.[24]

58.    The guidelines further recommend that businesses implement an array of specific methods to protect their systems, such as:

a.    Using an intrusion detection system to expose a breach as soon as it occurs;

b.    Monitoring all incoming traffic for activity indicating someone is attempting to hack the system;

c.    Watching for large amounts of data being transmitted from the system; and

d.    Having a response plan ready in the event of a breach.[25]

59.    For example, Defendant is prohibited by Federal Trade Commission Act, 15 U.S.C. §45 (the "FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce."    The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' Sensitive Private Information is an "unfair practice" in violation of the FTC Act.

60.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer and consumer data, including employee and human resources data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited

---

[24]    FED. TRADE COMM'N., PROTECTING PERSONAL INFORMATION: A GUIDE FOR BUSINESS (2016), https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business.

[25]    *Id.*

by Section 5 of the FTC Act.  While Defendant is prohibited by the FTC Act from engaging in "unfair or deceptive acts or practices in or affecting commerce," Defendant nonetheless failed to implement reasonable and appropriate security measures to protect against unauthorized access to its employees confidential Sensitive Private Information.

61.    Further, the National Institute of Standards in Technology ("NIST") publishes specific recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[26] Defendant failed to adhere to NIST guidance.

62.    For example, NIST recommends that, to prevent security breaches through phishing attacks, companies should: require employees to practice regular exercises in no-notice social engineering attempts to collect information and gain unauthorized access to company systems; educate employees on the adverse impact of opening malicious email attachments; provide literacy training on recognizing and reporting potential and actual instances of social engineering and social mining; and monitor emerging vulnerabilities (like new social engineering techniques) and implement procedures to mitigate the risks of those vulnerabilities.[27]

63.    NIST further recommends that, to limit the impact of a data breach, organizations must dispose of information in its custody or control once it is no longer needed.[28]

---

[26]    NIST U.S. DEP'T OF COMM., SPECIAL PUBLICATION 800-53, *Security and Privacy Controls for Information Systems and Organizations* (Sep. 2020), https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r5.pdf.

[27]    *Id.* at 60-61.

[28]    *Id.* at 352.

64. Upon information and belief, Defendant implemented inadequate security measures and failed to comply with industry standards to prevent social engineering and ransomware attacks, specifically by:

    a. failing to adequately train employees on phishing attacks, social engineering attacks, and ransomware attacks;

    b. failing to conduct simulated phishing campaigns to test readiness;

    c. failing to implement procedures to mitigate the risk of social engineering and ransomware attacks;

    d. failing to implement advanced email security platforms with phishing detection;

    e. failing to conduct real-time URL and attachment scanning;

    f. failing to implement Zero Trust network architecture;

    g. failing to implement endpoint detection and response (EDR) systems;

    h. failing to adequately monitor its systems for suspicious activity;

    i. failing to adequately encrypt or otherwise secure Sensitive Personal Information in its custody;

    j. failing to detect unauthorized access in a timely manner; and

    k. failing to promptly contain the intrusion once it occurred.

65. Defendant also failed to implement reasonable and appropriate data minimization and retention practices, particularly for the type of data it chose to collect and keep. Defendant retained vast quantities of Sensitive Private Information—long after such information was reasonably necessary for legitimate business purposes, thereby increasing the scope and severity of the Data Breach.

66.     Reasonable data security measures—such as network segmentation, access controls, employee training, encryption of sensitive data, intrusion-detection systems, advanced email security platforms with phishing detection, and regular vulnerability testing—were available, widely adopted in Defendant's industry, and necessary to protect the Sensitive Private Information entrusted to Defendant.

67.     Defendant failed to implement or properly maintain these reasonable measures, despite representing that it would safeguard Sensitive Private Information and despite its obligations under applicable laws, regulations, and industry standards.

68.     As a direct and proximate result of Defendant's data security failures, unauthorized actors were able to access Defendant's systems, exfiltrate Sensitive Private Information, and publish that information on the Dark Web, causing the injuries alleged herein.

## V.     THE DATA BREACH PUT PLAINTIFF AND CLASS MEMBERS AT IMMINENT RISK OF FRAUD, IDENTITY THEFT, AND OTHER CYBERCRIMES.

69.     Defendant's failure to keep Plaintiff's and Class Members' Sensitive Private Information secure has severe ramifications.

70.     Given the nature of the Sensitive Private Information stolen in the Data Breach, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future.

71.     Plaintiff has already suffered injury, including misuse of the information stolen in the Data Breach, and face an imminent and substantial risk of further injury including identity theft and fraud and related cybercrimes due to the Data Breach.

20

72.     Plaintiff's and Class Members' Sensitive Private Information from the Data Breach is already circulating on the "Dark Web," as confirmed by the hackers themselves.[29]

73.     Criminal law also recognizes the value of Sensitive Private Information by imposing harsh prison sentences for those who steal this data.  This strong deterrence is necessary because cybercriminals extract substantial revenue through the theft and sale of Sensitive Private Information by: (1) demanding a ransom or blackmail payment for its destruction, (2) using Sensitive Private Information to commit fraud or identity theft, or (3) selling Sensitive Private Information to other cybercriminals on the black market and on the Dark Web.

74.     Once cybercriminals start committing fraud and other identity theft-related crimes using a victim's Sensitive Private Information, the disruption to the victim's life can be catastrophic.  A study by the Identity Theft Resource Center ("ITRC") found that, among individuals who experienced fraudulent use of their Sensitive Private Information, nearly all of them had experienced some form of costs or other harm in their lives, including having to borrow money, being forced out of their home or residence, and being unable to care for their family.[30]

75.     Further, although the theft of Sensitive Private Information creates an imminent risk of becoming a victim of identity theft and fraud, malicious actors often wait months or years to use the PII obtained in data breaches.  GAO determined that "stolen data may be held for up to a year or more before being used to commit identity theft," and that "once stolen data have been

---

[29]     Vilius Petkauskas, *Inside the Charter data breach: hackers leak 13M+ customer data*, CYBERNEWS (May 28, 2026), https://cybernews.com/security/charter-spectrum-data-breach-millions-exposed/.

[30]     *Identity Theft Resource Center 2025 Consumer Impact Report*, IDENTITY THEFT RESOURCE CENTER, 16 (October 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/10/The-2025-ITRC-Consumer-Impact-Report.pdf.

21

sold or posted on the Web, fraudulent use of that information may continue for years."[31]  During this delay, victims often become complacent and less diligent in monitoring their accounts after a significant period has passed.

76.    Cybercriminals will also re-use stolen Sensitive Private Information, meaning individuals can be the victim of several cybercrimes stemming from a single data breach.

77.    Beyond all of the injuries described, events like the Data Breach also have a deep psychological impact on their victims:

> In some ways, a cyber attack can feel like the digital equivalent of getting robbed, with a corresponding wave of anxiety and dread.  Anxiety, panic, fear, and frustration—even intense anger—are common emotional responses when experiencing a cyber attack.  While expected, these emotions can paralyze you [. . .].[32]

### PLAINTIFF'S EXPERIENCES

78.    Plaintiff Ruschman is a customer of Defendant.

79.    Plaintiff Ruschman's Sensitive Private Information was accessed and exfiltrated in the Data Breach.

80.    Plaintiff Ruschman would not have entrusted her information with Defendant if she knew of Defendant's deficient data security practices.  Plaintiff Ruschman only allowed Defendant to maintain, store, and use her Sensitive Private Information because she reasonably expected that Defendant would use basic security measures to protect the information entrusted to it and prevent its access by unauthorized third parties.

---

[31]    U.S. GOV'T ACCOUNTABILITY OFF., GAO-07-737, DATA BREACHES ARE FREQUENT, BUT EVIDENCE OF RESULTING IDENTITY THEFT IS LIMITED; HOWEVER, THE FULL EXTENT IS UNKNOWN 42 (2007), https://www.govinfo.gov/content/pkg/GAOREPORTS-GAO-07-737/html/GAOREPORTS-GAO-07-737.htm.

[32]    Amber Steel, *The Psychological Impact of Cyber Attacks*, LASTPASS (Aug. 17, 2022), https://blog.lastpass.com/posts/the-psychological-impact-of-cyber-attacks.

81.     As a result of the Data Breach, Plaintiff has experienced the following injuries: suspicious communications requesting information from her and increased spam and junk calls and text messages.

82.     Plaintiff has had to spend time and effort mitigating the risk of harm caused by the Data Breach, including the following: changing passwords and access information to his account with Defendant and with other institutions and time spent researching and responding to the Data Breach.

83.     As a result of the disclosure of Sensitive Private Information to unauthorized individuals due to the Data Breach, Plaintiff Ruschman has suffered an invasion of privacy.

84.     As a result of the Data Breach, Plaintiff Ruschman has suffered anxiety, stress, and emotional distress arising from the loss of control over her Sensitive Private Information and the ongoing risk of misuse.

## CLASS ACTION ALLEGATIONS

85.     Plaintiff brings this action on behalf of herself, and all others similarly situated pursuant to FED. R. CIV. P 23(a), 23(b)(2), and 23(b)(3).

### A.     Class Definitions

86.     Plaintiff seek to represent the following Class:

All persons residing in the United States and its territories whose Sensitive Private Information was accessed, exfiltrated, or otherwise compromised in the Charter data breach that occurred in or around April 1, 2026 (the "Class").

87.     Excluded from the Class are Defendant; any entity in which Defendant has a controlling interest; Defendant's officers, directors, employees, legal representatives, successors, and assigns; and the judicial officer assigned to this case and members of the judicial officer's immediate family.

23

88.    Plaintiff reserves the right to amend or modify the Class definition as discovery and further investigation reveal additional facts.

**B.    Numerosity**

89.    The Class is so numerous that joinder of all members is impracticable. Upon information and belief, the Data Breach compromised the Sensitive Private Information of tens of thousands of individuals.

**C.    Commonality**

90.    Questions of law and fact are common to the Class and predominate over questions affecting only individual members. Common questions include, but are not limited to:

a.    Whether and to what extent Defendant had a duty to protect the Sensitive Private Information of Plaintiff and Class Members;

b.    Whether Defendant were negligent in collecting and storing Plaintiff's and Class Members' Sensitive Private Information;

c.    Whether Defendant had duties not to disclose the Sensitive Private Information of Plaintiff and Class Members to unauthorized third parties;

d.    Whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class Members' Sensitive Private Information;

e.    Whether Defendant failed to adequately safeguard the Sensitive Private Information of Plaintiff and Class Members;

f.    Whether Defendant breached its duties to exercise reasonable care in handling Plaintiff's and Class Members' Sensitive Private Information;

g.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

24

h.      Whether Defendant failed to timely detect, contain, and investigate the Data
Breach;

i.      Whether Defendant failed to timely and adequately notify Plaintiff and
Class Members of the Data Breach;

j.      Whether Defendant's acts and omissions caused Plaintiff's and Class
Members' injuries;

k.      Whether Plaintiff and Class Members suffered legally cognizable damages
as a result of the Data Breach and Defendant's wrongful conduct; and

l.      Whether Plaintiff and Class Members are entitled to injunctive or
equitable relief to, *inter alia*, redress the imminent and currently ongoing
harm faced as a result of the Data Breach.

**D.     Typicality**

91.     Plaintiff's claims are typical of the claims of the Class because Plaintiff and all
Class Members were subjected to the same Data Breach, had their Sensitive Private Information
compromised as a result of Defendant's uniform conduct, suffered similar injuries arising from
Defendant's failures, and Plaintiff's and Class Members' claims are premised on the same legal
theories.

**E.     Adequacy**

92.     Plaintiff will fairly and adequately protect the interests of the Class, because
Plaintiff's interests are not antagonistic to those of the Class that Plaintiff seek to represent, and
Plaintiff are committed to vigorously prosecuting this action.

93.     Plaintiff have retained counsel that are competent and experienced in complex class
action litigation, data breach cases, and consumer and privacy protection matters, have adequate

financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed, and are committed to adequately representing the interests of the Class.

## VI.    PREDOMINANCE AND SUPERIORITY—RULE 23(B)(3)

94.    Common questions of law and fact predominate over any questions affecting only individual members of the Class.  Defendant engaged in a common course of conduct that gives rise to Plaintiff's and Class Members' claims, and this litigation will turn on similar or identical violations, business practices, and injuries.  Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.  For example, Defendant's liability and the fact of damages are common to Plaintiff and each member of the Class.  If Defendant breached its duties and failed to protect Plaintiff's and Class Members' PII from theft and misuse, then Plaintiff and each Class member suffered damages by that conduct.

95.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation or joinder of all Class members would be impracticable and inefficient given the number of affected individuals and the common factual and legal issues presented.  The proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

## VII.    INJUNCTIVE AND DECLARATORY RELIEF—RULE 23(B)(2)

96.    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

97.    As demonstrated by the Data Breach, Defendant has failed to implement and maintain reasonable administrative, technical, and physical safeguards to protect Plaintiff's and

26

Class Members' Sensitive Private Information, and has demonstrated an inability or unwillingness to do so absent judicial intervention.

98.     Plaintiff and Class Members therefore remain at a continuing and imminent risk of harm because their Sensitive Private Information remains in Defendant's possession, custody, or control, and Defendant's systems have already been shown to be vulnerable to compromise.

99.     Plaintiff therefore seek injunctive relief requiring Defendant to implement reasonable and appropriate data security measures, improve breach detection and response protocols, limit the collection and retention of Sensitive Private Information to that which is reasonably necessary for legitimate business purposes and delete all data that is no longer reasonably necessary for Defendant to have in its possession, custody and control, provide appropriate data security training for employees, undergo periodic third-party security assessments, and comply with applicable data protection and notification obligations to prevent Plaintiff's significant, imminent, and ongoing risk of future harm.

## CAUSES OF ACTION

### <u>COUNT I</u>
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

100.    Plaintiff restates and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

101.    Defendant owed Plaintiff and Class Members a duty to exercise reasonable care in collecting, storing, maintaining, and safeguarding their Sensitive Private Information to prevent that information from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

102.    Defendant's duty arose from Defendant's affirmative collection of Plaintiff's and Class Members' Sensitive Private Information, exclusive possession and control of that

27

information, the foreseeability of harm from unauthorized access, Defendant's representations and practices regarding data security, and Defendant's obligations under applicable laws, regulations, and industry standards.

103. Defendant has full knowledge of the sensitivity and value of the Sensitive Private Information that it collected from Plaintiff and Class Members, and the type of harm that Plaintiff and Class Members would suffer if their Sensitive Private Information was stolen and/or wrongfully disclosed.

104. Defendant's duty to use reasonable care arose from several other sources, including but not limited to those alleged herein.

105. Defendant further had common law duties to prevent foreseeable harm to Plaintiff and Class Members. These duties existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices. Defendant knew that it was collecting and maintaining highly Sensitive Private Information, that its computing systems and data storage architecture were vulnerable to unauthorized access, and that Defendant's systems would be targeted hackers for the purpose of stealing and misusing the troves of highly valuable Sensitive Private Information that it collected, stored, and retained.

106. Defendant had a duty to employ reasonable security measures under Section 5 of the FTC Act, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

107. Additionally, Defendant assumed a duty to Plaintiffs and the Class to protect their Sensitive Private Information. As such, when individuals and entities provided Defendants with Plaintiff's and the Class's Sensitive Private Information and Defendants accepted and stored that

data (for their own purposes and to their own financial benefit), Defendants assumed a duty to protect that Sensitive Private Information.

108.    Defendant also had a duty to safeguard the Sensitive Private Information of Plaintiff and Class Members and to promptly notify them of a breach under various state laws and statutes that require Defendant to reasonably safeguard sensitive Private Information, as detailed herein.

109.    Defendant's duty to exercise reasonable care regarding Plaintiff's and Class Member's Sensitive Private Information included, among other things: (a) designing, maintaining, and testing its security systems to ensure that Plaintiff's and Class Members' Personal Information in Defendant's possession was adequately protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) properly training employees to prevent breaches of its systems; and (d) maintaining security measures consistent with industry standards, including regularly updating, patching, and evaluating security measures.

110.    Defendant's duties extended to protecting Plaintiff and the class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts §302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard Personal Information.

111.    Defendant also had a duty to provide timely, adequate notification of a data breach so that, among other things, Plaintiff and Class Members could take appropriate measures to freeze or lock their credit profiles; avoid unauthorized charges on their credit or debit card accounts; monitor their account information and credit reports for fraudulent activity; contact their banks or other financial institutions that issue their credit or debit cards; obtain credit monitoring services;

29

and take other steps to mitigate or ameliorate the damages caused by Defendant's misconduct. Defendant was the only entity that had sufficient knowledge to properly provide this notice.

112. Defendant breached the duties it owed to Plaintiff and Class Members alleged above and, thus, was negligent in failing to do so. Defendant breached these duties by, among other things: (a) implementing inadequate security systems, protocols and practices that were insufficient to protect the Sensitive Private Information of Plaintiff and Class Members; (b) failing to adequately monitor its systems for suspicious activity; (c) failing to timely detect, investigate, and contain the Data Breach and other unauthorized activity on its system while it was ongoing; (d) implementing inadequate and unreasonable access controls, intrusion-detection, and data-protection measures; (e) implementing security systems that did not comply with industry standards; (f) failing to comply with regulations protecting the Sensitive Private Information at issue during the period of the Data Breach; (f) over-retaining Sensitive Private Information for longer than reasonably necessary; and (g) inadequately disclosing the Data Breach to Plaintiff and Class Members in an unreasonably delayed manner.

113. Defendant's acts and omissions fell below the standard of care that an entity entrusted with Sensitive Private Information would reasonably exercise under similar circumstances.

114. As a direct and proximate result of Defendant's negligence, unauthorized actors accessed and exfiltrated Plaintiff's and Class Members' Sensitive Private Information, causing the injuries and damages alleged herein.

115. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their Sensitive Private Information would not have been compromised.

116. Defendant's failure to take proper security measures to protect the Sensitive Private Information of Plaintiff and Class Members created conditions conducive to a foreseeable, intentional act, namely the unauthorized access of Plaintiff's and Class Members' Sensitive Private Information. As the entity collecting and storing Plaintiff's and Class Members' Sensitive Private Information, Defendant was in the best position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

117. Plaintiff and Class Members were foreseeable victims of Defendant's inadequate data security practices, and it was also foreseeable that Defendant's failure to provide timely and adequate notice of the Data Breach would result in injury to Plaintiff and Class Members as alleged in this Complaint.

118. Defendant's negligence was therefore a substantial factor in causing Plaintiff's and Class Members' injuries, and Plaintiff and Class Members' injuries are the direct and proximate result of Defendant's wrongful and negligent conduct.

119. Plaintiff's and Class Members' injuries include: (a) actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (b) the loss of the value of their privacy and the confidentiality of the stolen Sensitive Private Information and loss of control over their Sensitive Private Information; (c) the illegal sale of the compromised Sensitive Private Information on the black market; (d) the present and continuing threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (e) mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; (f) the time spent in response to the Data Breach reviewing bank statements, credit card statements, financial account statements, credit reports, and other related activities; (g) the expenses incurred and time spent initiating fraud alerts; (h) the resulting decrease in credit scores

31

and ratings; (i) emotional distress; (j) their lost work time; (k) the lost value of the Sensitive Private Information; (l) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Data Breach; and (m) nominal and general damages and other economic and non-economic harm suffered.

120.    Plaintiff and Class Members seek all relief available under law, including compensatory and consequential damages, restitution, injunctive relief requiring Defendant to implement reasonable data security measures and compliance programs, and such other relief as the Court deems just and proper.

## COUNT II
### NEGLIGENCE *PER SE*
**(On Behalf of Plaintiff and the Class)**

121.    Plaintiff reallege and incorporate by reference the foregoing allegations, as if fully set forth herein.

122.    Defendant owed a duty to Plaintiff and Class Members to keep their Sensitive Private Information secure, arising under FTC Act.

123.    Specifically, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Defendant for failing to use reasonable measures to protect Sensitive Private Information.  Various FTC publications and orders further form the basis of Defendant's duty.

124.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Sensitive Private Information and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Sensitive Private Information it obtained and stored and the foreseeable consequences of a data breach involving the highly Sensitive Private Information that Defendant collected, stored, and maintained, including the damages that would result to Plaintiff and Class Members.

125. Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

126. Defendant's violations of Section 5 of the FTC Act constitute negligence *per se*.

127. Defendant violated its duties by, among other things, inadequate security systems, protocols and practices that were insufficient to protect the Sensitive Private Information of Plaintiff and Class Members, and by failing to timely and adequately notify Plaintiff and Class Members of the Data Breach.

128. Defendant's violations constitute negligence *per se* because Defendant violated laws designed to protect a specific class of persons—Plaintiff and Class Members—from a particular type of harm that Defendant's conduct caused.

129. Plaintiff and Class Members suffered injuries of the type the statutes were intended to prevent, including: (a) actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (b) the loss of the value of their privacy and the confidentiality of the stolen Sensitive Private Information and loss of control over their Sensitive Private Information; (c) the illegal sale of the compromised Sensitive Private Information on the black market; (d) the present and continuing threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (e) mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; (f) the time spent in response to the Data Breach reviewing bank statements, credit card statements, financial account statements, credit reports, and other related activities; (g) the expenses incurred and time spent initiating fraud alerts; (h) the resulting decrease in credit scores and ratings; (i) emotional distress; (j) their lost work time; (k) the lost value of the Sensitive Private Information; (l) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as

mitigation measures because of the Data Breach; and (m) nominal and general damages and other economic and non-economic harm suffered.

130. Defendant's violations of these statutes were a direct and proximate cause of Plaintiff's and Class Members' injuries and damages.

131. As a result of Defendant's negligence per se, Plaintiff and Class Members are entitled to all relief available under law, including compensatory and consequential damages, statutory damages where available, injunctive relief, and such other relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of themselves and the Class, respectfully request that the Court enter judgment in their favor and against Defendant, and grant the following relief:

A.   Certify this action as a class action pursuant to FED. R. CIV. P. 23, appoint Plaintiff as Class Representatives, and appoint Plaintiff's counsel as Class Counsel;

B.   Declare that Defendant breached its duties to Plaintiff and Class Members, and that Defendant's acts and omissions described herein violate Plaintiff's and Class Members' legal rights;

C.   Grant injunctive relief to prohibit Defendant from unlawfully retaining Plaintiff's and the Class's Sensitive Private Information and continuing to engage in the unlawful acts, omissions, and practices described herein, and requiring Defendant to implement improved security procedures and measures, including, *inter alia*:

   1.   Requiring Defendant to implement and maintain a comprehensive information security program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' Sensitive Private Information;

34

2. Requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

3. Requiring Defendant to adequately train employees on phishing attacks, social engineering attacks, and ransomware attacks;

4. Requiring Defendant to implement procedures to mitigate the risk of social engineering and ransomware attacks, including implementing advanced email security platforms with phishing detection, conducting real-time URL and attachment scanning, implementing Zero Trust network architecture, and implementing endpoint detection and response (EDR) systems;

5. Requiring Defendant to routinely and continually conduct internal training and education, at least annually, to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

6. Requiring Defendant to implement a system to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting Sensitive Private Information;

7. Requiring Defendant to implement, maintain, regularly review, and revise as necessary, a threat management program designed to appropriately monitor information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

D.      Award Plaintiff and Class Members actual damages, compensatory damages, and nominal damages as allowable by law and in an amount to be determined;

E.      Order restitution, disgorgement, and all other equitable monetary relief necessary to remedy Defendant's unjust enrichment;

F.      Order Defendant to provide appropriate notice, remediation, and ongoing protective services reasonably necessary to mitigate future harm to Plaintiff and Class Members whose Sensitive Private Information was compromised;

G.      Award Plaintiff and Class Members their reasonable attorneys' fees, costs, and expenses incurred in this action, as permitted by law;

H.      Award pre-judgment and post-judgment interest as allowed by law;

I.      Enter all other Orders, findings, and determinations identified and sought in this Complaint; and

J.      Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: June 2, 2026                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                       /*s*/ Joseph P. Guglielmo
                                       Joseph P. Guglielmo (CT 27481)
                                       The Helmsley Building
                                       230 Park Avenue, 24th Floor
                                       New York, NY 10169
                                       Telephone: (212) 223-6444
                                       Facsimile:  (212) 223-6334
                                       jguglielmo@scott-scott.com

                                       Brian C. Gudmundson (*pro hac vice* forthcoming)
                                       Michael L. Laird (*pro hac vice* forthcoming)
                                       Benjamin R. Cooper (*pro hac vice* forthcoming)
                                       Madison M. DeMaris (*pro hac vice* forthcoming)
                                       **ZIMMERMAN REED LLP**

36

1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.com
benjamin.cooper@zimmreed.com
madison.demaris@zimmreed.com

*Attorneys for Plaintiff and the Proposed Class*

37